EXHIBIT E to
Document # 72

1

Case No.1:08-CV-509-LTS-RHW

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION

————————————————————————————

BETWEEN:

{"MARION S. LEBON and        LISA COWAND

Plaintffs

vs.

State Farm & Casualty Company

Defendants

—————————————————————————————————————{

Deposition of

Curtis Hilgerson

—————————————————————————————————————

2

APPEARANCES

1
2
3
4   Deborah R. Trotter                For the Plaintiffs
5   Merlin Law Group, P.A.
6   368 Courthouse Rd, Suite C
7   Gulfport, MS
8           39507
9   (228) 604-1176
10
11
12  Lawrence Tucker                   For the Defendants
13  Hickman, Goza & Spragins
14  P.O. Drawer 668
15  Oxford, MS
16          38655
17  (662) 234-4000
18
19
20
21
22
23          Taken before Kathryn E. Vail, Official Court Reporter, at
24  13011 Lakeshore Drive, Summerland, British Columbia, on the 15th
25  of October, 2009.

Curtis Hilgerson                                    October 15, 2009

7

1           detail about the claims and the particular files that I

2           have brought with me today.

3    A      Okay.

4    Q      So, if you don't mind, I really am not trying to pry or

5           anything, but it's all relevant information.

6                 Do you have any family in Mississippi?

7    A      No.

8    Q      How is it that you came to work claims in Mississippi?

9    A      I was hired by Pilot Catastrophe Services through one of

10          the managers named Mark Ward, who lives in Summerland.

11   Q      Okay.  How long has Mark Ward worked with Pilot?

12   A      I don't know.

13   Q      And so how long have you worked with Pilot?

14   A      Five years.

15   Q      And today you still work with Pilot?

16   A      Correct.

17   Q      Looking over the Subpoena that asks for certain documents,

18          let me ask you, do you keep a personal claim file when you

19          adjust claims?

20   A      No.

21   Q      Do you use a laptop?

22   A      Provided by State Farm.

23   Q      Okay.  And now is that laptop checked out to you for a

24          specific assignment and then returned?

25   A      Yes.

8

1    Q    Okay.  The laptop is preloaded with software?

2    A    Correct.

3    Q    Is there -- on the laptop hard drive itself, is there a

4         place where you would have a file on the C-drive that you

5         would put your documents into while you are out in the

6         field?

7    A    Not to my knowledge.  The files stay within the estimating

8         system or the system where you put your log notes, which

9         is all connected to State Farm's internal system.

10   Q    Okay.  So, after doing some work within the program -- let

11        me go ahead and ask you is the program you are speaking of

12        is that Xactimate?

13   A    Yes.

14   Q    So you are working within the Xactimate program, it all

15        just kind of stays within the program, you log on to the

16        internet and you are then connected to a shared server?

17   A    For your log notes, correct.  Yes.

18   Q    Do you have any paper files you keep?

19   A    Only for State Farm.

20   Q    And when you mean, for State Farm you have like a manila

21        folder?

22   A    If you are working flood claims you have a paper file.

23   Q    Okay.

24   A    But in my experience everything we have done so far is all

25        electronic.

59

1   Q    What kind of reports would you send to your team manager

2        regarding your investigation, estimation and evaluation of

3        these claims?  Did you have telephone reporting, where you

4        would check in periodically or did you just finish the

5        reports and send the final in?

6   A    Normally if I didn't have any questions, I would finish my

7        estimate, upload all my log notes concerning what I saw,

8        any and all documents provided by the policy holder,

9        photographs were uploaded, and submit that for review with

10       my recommendations whether it be payment or denial.

11          If I had questions I would call them first before I

12       submitted it to them.

13  Q    Okay.  Is there a specific site that you went to, to upload

14       your files?

15  A    Well Xactimate uploads to a specific server.  And on the

16       State Farm system where we file our log notes system and

17       that is also where we upload the photographs, that is all

18       within the State Farm system.

19  Q    So do they give you a user ID and a log on?

20  A    Yes.  I believe we also printed off a copy of the estimate

21       so that they could review it, and if there is any changes

22       needed they would put red marks on it and give it back to

23       you for anything that is done on the file.

24  Q    If you had like handwritten notes how would you, did you

25       scan those and then upload them?

 1   A   Yes.

 2   Q   And date 10/19/05 would be log entry No. 7.  It looks like

 3       an entry made by you; is that correct?

 4   A   Correct.

 5   Q   It looks like there is another one prior to that No. 6.

 6   A   M'hm.

 7   Q   And another one dated 10/10.  Okay.  On 10/10, go ahead and

 8       read that entry No. 5 dated 10/10 that you put in.

 9   A   Inspected risk with Mrs. Policy Holder.  Only the slab

10       remains.  Measured footprint and obtained information

11       regarding contents from Mrs. Policy Holder, took photos of

12       the risk and surrounding area.

13   Q   Okay.  That says you inspected on 10/10/05.  The other

14       document we read had the inspection date of 10/15.  And

15       you said that is the day you would have met with the

16       policy holder.

17   A   This is probably a more accurate date.

18   Q   Okay.

19   A   The 10/10, the enter date in the estimate that we were

20       looking at and then inspection date was 10/15, I probably

21       just didn't change it, either that or I had to go out

22       there and again and confirm things.

23   Q   Okay.

24   A   But the activity log we do that day.

25   Q   So. And do you see the entry below it 9/25/05 Ida

90

1          limits for coverage A and B.  Draft authority requested

2          for $100,000 coverage A and $40,000 coverage B.  Reviewed

3          ICC with policy holder and she requested that no brochure

4          be sent that she was well versed on the subject.  File

5          submitted for review and settlement.  Enclosure.

6  Q  And the next thing you did was submitted to Jody Prince as

7          noted in the log there at 10/21/05?

8  A  Correct.

9  Q  Okay.  On page 69 -- actually it starts on 67.  There is a

10        section in the activity log called "documented changes".

11        Okay.

12  A  M'hm.

13  Q  So under that "documented changes" it continues for a

14        couple of pages.  And on page -- let's see here it is on

15        page 70.  It shows some documented changes made by you on

16        10/10, entry No. 7 it says you changed the date from

17        9/15/05 to 10/10/05, do you recall why?

18  A  I need the file to reflect the date that I inspected it not

19        the date of whoever had the file before me.

20  Q  Okay.

21  A  And then they also changed the "inspected by" to my alias

22        instead of whoever had it before me.

23  Q  M'hm.

24  A  The same as the contact dates and who contacted.

25  Q  Did you actually make these changes or did somebody else?

91

| | | |
|---|---|---|
| 1 | A | That should have been me making the changes. |
| 2 | Q | Okayy. So you went through and changed contact dates and |
| 3 | | inspection dates? |
| 4 | A | Correct. |
| 5 | Q | And it was from entries before? They had -- let me ask you |
| 6 | | again. The date 9/15/05 inspection date was assigned to |
| 7 | | you originally? This date of inspection they they had it |
| 8 | | under your name? |
| 9 | A | 9/15 would not have been my date. Somebody else would have |
| 10 | | entered that date in there, whoever had the file before |
| 11 | | me. |
| 12 | Q | M'hm. |
| 13 | A | And from a review of the documents it looks like that Ida |
| 14 | | had the file before me; that's her inspection date, that's |
| 15 | | her contact date, I would guess. A lot of times we would |
| 16 | | get a file that's already been contacted, but when we |
| 17 | | speak to the policy holder we need to change that date to |
| 18 | | our date and our alias, so that whoenever is reviewing |
| 19 | | file can see when they do the report it shows when we've |
| 20 | | contacted the people. |
| 21 | Q | Okay. So from these changes there was an inspection date |
| 22 | | by someone else identified as G2BZ on 9/15/06? |
| 23 | A | '05. |
| 24 | Q | '05, I'm sorry. |
| 25 | A | That's what it looks like from the documents,yes. |

1    Q    And then that same, that other contact was changed from the

2         date was BSGQ?

3    A    Right.

4    Q    All right.  Do you have any idea who G2BZ is?

5    A    No.

6    Q    BSGQ?

7    A    No.

8    Q    Okay.  You just know those were inspection dates and

9         contact dates that you didn't perform?

10   A    Right.

11   Q    So, why would you change that?  Why would that not just be

12        represented on it's own that so-and-so contacted on those

13        dates and inspected on those dates; and then you came in

14        and did your inspections and contacts a month later?

15   Mr. Tucker:  Object to the form.

16   A    There is only one spot, there is only one date available.

17        So we need the file to reflect our contact dates and our

18        inspection dates when we are reviewed by management.  I

19        believe that's why they put in the changes so you can see

20        who had it before and what happened.  But I didn't make

21        the program, there is only one line, one date available.

22        When we get the file we are instructed to update that to

23        our contact and our inspection.  Because when they pull

24        the reports if we didn't change the contact date it would

25        show we contact the person yet.  And then we would be

1      contacted by management saying, you need to contact these

2      people.

3   Ms. Trotter:

4   Q    But it's an activity log by date?

5   A    Right.

6   Q    Wouldn't you expect every date to have an entry of action

7        -- that had action?

8   Mr. Tucker:  Object to the form of the question.

9   A    Well in the log itself --

10  Ms. Trotter:

11  Q    Okay.  Look back to page 61 --

12  A    -- there is --

13  Q    -- the activity log around that time where you are changing

14       dates from 9/16 to 9/15.  There's no activity log entry

15       that shows Ida inspected on 9/15 or contacted anyone on

16       9/16.

17  A    There is.  There is one right there.  9/25/05 Ida

18       McCallister inspected risk 9/15/05.

19  Q    M'hm, on 9/25?

20  A    Right.  So that's when she entered it.

21  Q    And then your entry comes in on 10/10, inspected risk with

22       Mrs. Policy Holder --

23  A    M'hm.  It looks like Ida's date is entered ten days after

24       she actually inspected it according to her notes, but.

25  Q    Prior to the risk being assigned to you, prior to your risk

1          assignment?

2    A    Yes.

3    Q    So the documented changes on those dates misrepresent the

4          claim file as far as the activity log goes, wouldn't you

5          say?

6    Mr. Tucker:  I object to the form of the question.

7    A    I honestly don't understand.

8    Ms. Trotter:

9    Q    If the activity log is a log of every activity by date,

10         documented changes should coincide with the activities in

11         the log, right?

12   Mr. Tucker:  Object to the form of the question.

13   A    I'm not sure to be honest.

14   Ms. Trotter:

15   Q    If you look on page 70 --

16   A    Yeah.

17   Q    -- there is just a whole section missing there?

18   A    10/10/05, is when I changed it.

19   Mr. Tucker:  Same objection.

20   A    I can't comment on as to what happened before. When I got

21         the file I changed my dates and I took it from there.  I

22         don't know what happened prior to me getting the file

23         assigned to me.

24   Ms. Trotter:

25   Q    Okay.

1    A    All right.

2    Mr. Tucker:  You need a 30(B)(6)witness to discuss these topics.

3         We will be happy to provide one.

4    Ms. Trotter:  Okay.

5    Mr. Tucker:  You sign a notice, and we'll get you a witness.

6    Ms. Trotter:  I guess we'll have to do that.  You have to

7         understand the files.

8    Mr. Tucker:  I hear you.

9    Ms. Trotter:

10   Q    Let's move onto the homeowners' club file.  And it's

11        labeled 24-z504-786(FL) Lebon 10001 through 94.  You

12        inspected the house and the cottage at the same time; is

13        that right?

14   A    From my recollection, yes.

15   Q    Here is a copy for you to flip through.  I hate to do this,

16        but we are going to attach the cottage flood file as

17        Exhibit 3.

18

19        (Exhibit - 3 for the Plaintiff:  24-z504-793(FL) Lebon

20        100001 -100086)

21

22   Ms. Trotter:

23   Q    Okay.  On page 5 it looks like another reserve final

24        payment information worksheet; is that your handwriting?

25   A    Yes.

1    estimate to State Farm?

2  A    Not to my recollection.

3  Q    Okay.  If you go to page 63 in the file there is a page

4    where log notes are entered by you in the activity log.

5    They appear to be the same log notes that we looked at in

6    the previous flood file for the cottage.  Will you look

7    those over and tell me if you agree?

8  A    Yeah, they look similar.  Do you want me to identify --

9  Q    Do you want to compare?  Let me see Exhibit 3, please and

10    see if there are any added or different ones?

11  A    Yeah.  It looks like I used one as a template because the

12    information was similar and I had forgotten to change the

13    amounts for the draft authority.  And so on the next log

14    there is an edit to change those logs.

15  Q    Okay.  Does that tell you that you did the cottage first?

16  A    (Witness shakes head).

17  Q    No?

18  A    That's what it looks like.  I can't tell you 100% to be

19    honest.  I may have done this one first and pasted it over

20    and saw the error.  From what it looks like I might have

21    done the cottage first and saved the log as a paste to

22    save some time because the information is identical, but I

23    forgot to change the draft authority amounts.

24  Q    But you wouldn't go back into the other activity log and

25    make a documented change, you would just add the

102

1    information to the next log; is that right?

2  A    You can't go back and change it.  Once you have saved it,

3    once you hit enter you can't touch it.  So that is why I

4    couldn't go back and edit this one, I had to add a new log

5    to say there was an error to the amounts and this is what

6    it should reflect.

7  Q    Okay.  The document change feature you couldn't use that

8    for a situation like this?

9  Mr. Tucker:  Object to the form.

10  A    We don't -- sorry.

11  Mr. Tucker:  Go ahead.

12  A    We don't use that.

13  Ms. Trotter:

14  Q    You just added another entry that you had added previously?

15

16  A    Correct.

17  Ms. Trotter:  Okay.  That is it for the flood file then.  Thank

18    you.  We'll go ahead and attach that as Exhibit 4.

19

20    (Exhibit - 4 for the Plaintiff:  24-z504-786(FL) Lebon

21    100001 - 100094)

22

23  Ms. Trotter:  We are ready to go back on the record.

24  Ms. Trotter:  All right.  We have already gone through the two

25    flood files, the one for the home and the other for the

117

```
1    Q    Seventy seven and 78?

2    A    Are there colour pictures we can look at?

3    Mr. Tucker:  My recollection is you are only going to find those

4         black and whites.

5    Ms. Trotter:  So we don't have a better colour photo.

6    Mr. Tucker:  They were provided by the insured during the

7         arbitration-mediation process.

8    Ms. Trotter:  Okay.

9    Mr. Tucker:  They are labeled by the insured as well.  I believe

10        there is a cover letter at some point.

11   Ms. Trotter:  I recognize them as the photos.  I will flip

12        through this fax set that's been in here three times to

13        see if they had tried to fax them in.  Maybe that's why

14        they look so rough.

15   Mr. Tucker:  Can we go of the record for a second?

16

17        [Off the Record]

18

19   Ms. Trotter:  We're back on the record.

20   Ms. Trotter:

21   Q    We are going to have to look at these.  They are not the

22        best shots, but they are photos.  Okay.  And they were

23        submitted, I'll represent to you, by the policy holder at

24        a later time.  They are photographs that were taken the

25        day after the storm.  And she's got notations, the policy
```

118

1          holder has notations on them "location of the house".

2     A    Right.

3     Q    Now in these photos there is a series of trees that are

4          broken and snapped.  Could these be some of the ones that

5          you were representing broken to approximately 10 to 15

6          feet when you went out?

7     A    I would imagine, yes.

8     Q    Okay.  And, the foundation of the home, if you look at page

9          78, you can see it just inside the broken trees here.  Do

10         you see like the little chain wall and concrete and brick

11         and the chain wall there?

12    A    Yes.

13    Q    That is the location of the home and those are like the two

14         photographs that the policy holder submitted?

15    A    Okay.

16    Q    Now let's look at the photographs that are taken on

17         10/19/05 starting on page 79, 80, 81, 82.  Eighty-three is

18         not marked.  So these four, 79 through 82 that are date

19         stamped 10/19, did you take those photographs?

20    A    I'm not 100 percent sure, but like I said, the file was in

21         my possession, so I would imagine, yes.  It's possible.

22    Q    It looks like in photo 79 that a couple of trees have

23         probably already have been removed.  And you can see some

24         debris of cut trees down by the street?

25    A    Yes.

1    Q    Do you recall on your site visit whether the property had

2           been cleared of the debris?

3    A    I don't believe so.  I don't remember any specific trees,

4           but, like I said, it is possible.

5    Q    And photograph No. 80, just beside the chairs it looks like

6           there is more trees that are cut up and ready to be hauled

7           down, do you see that?

8    A    Yeah.  If you look at 83 that is the vehicle that I was

9           using.

10    Q    Eighty-three.  So that's the next set.

11    A    That's a photo taken on 10/10 and there is the same tree

12           cap right here.

13    Q    So it looks like some of the trees had already been in the

14           process of being removed from the property when you got

15           there?

16    A    Quite possibly, yeah.

17    Q    Is there a date stamp on 83 where you noted it was 10/10?

18    A    No.

19    Q    Or that is when you recall that being the visit on 10/10?

20    A    Well I know that was the vehicle I rented --

21    Q    Oh, okay.

22    A    -- for riding around town.

23    Q    Oh, okay.  So you are certain 10/10 you went out and did an

24           inspection on the property?

25    A    Yes.

1  Q  10/19 you are not sure?

2  A  I am not 100 percent.  I normally would have made a log

3     note to that effect.

4  Q  Uncertain that is 10/19.  And the 10 photos from 83 to 85,

5     86 and 87.  There is only five photos here from 10/10?

6  A  Okay.

7  Q  The one you note your vehicle and the trees that look like

8     they have already been cut down.

9  A  M'hm.

10 Q  Okay.  10/10, the storm was August 29th, what in this

11    photograph is important to your determination that the

12    storm surge caused the damage to this property?

13 A  Location of the property to the Bay of St. Louis, the

14    proximity to the water.

15 Q  M'hm.  Anything else?

16 A  Um, the fact that all of the power lines, and such, are

17    still in tact.

18 Q  Do you know, for a fact, that those are still in tact and

19    not restrung?

20 A  I don't know with 100% certainty, no.

21 Q  Page 84.  I know we looked at this in one of the other

22    files, but it's been too long now.  Is that a picture of

23    the cottage or the house?

24 A  That looks to be the house.

25 Q  Okay.  And in that picture do you see any evidence of wind

123

1    Q    Okay.  Now the tree that is laid on it's side just in front
2         of the truck, it looks like it's falling between those two
3         trees that you just pointed out?
4    A    Right.
5    Q    And then the tree to the left, leaning basically in that
6         direction, what do those two trees represent to you?
7    A    Obviously damage from the storm.  I mean it's possible that
8         the tidal surge softened up the root ball and the tree got
9         pushed over with the tidal surge.  It could be the tidal
10        surge or debris from the house could have pushed the upper
11        tree over or broke it off.  I can't see what the cause of
12        the damage is from this picture.
13   Q    So you been pointed out there's only a handful of pictures
14        here, five; right?  So if you saw something like that, and
15        you did, you took a picture of it, wouldn't you go further
16        and investigate that to see exactly where that tree is
17        broken?
18   A    Well if I walk in -- I walked all around the property.  I
19        mean I took as many photos as I thought would indicate the
20        general damage to the property.
21   Q    So you think five photos represents the general damage to
22        the property?
23   Mr. Tucker:  Object to the form.  Argumentative.
24   Ms. Trotter:  I want to know, five photographs is that
25        representative of the property?

1    Mr. Tucker:  Is this again from both dates?

2    Ms. Trotter:  This is from 10/10.

3    Mr. Tucker:  The claim file contains more than five, doesn't it?

4

5    Ms. Trotter:  There are some that say 10/19, but he was even

6         certain whether he took those photographs or made that

7         visit.  So I'm asking him about the 10/10 photographs.

8         And there are five here.

9    Mr. Tucker:  Let's be clear what you are talking about.

10   Ms. Trotter:  There's five photographs here from his inspection

11        that he knows he took.

12   Mr. Tucker:  Okay.

13   Ms. Trotter:  He only took five photographs; is that what I'm to

14        understand?

15   Mr. Tucker:  I'm going to object to the form.

16   Ms. Trotter:

17   A    I took five photographs on 10/10, and it's possible that I

18        took the photographs on 10/19, I'm not certain.  Whatever

19        photographs I took on that date I felt represented damage

20        to the property.  I took photos for flood damage and there

21        were three different claims on this property.

22   Ms. Trotter:

23   Q    And some of the photos that are in the homeowners' file are

24        also in the flood file; is that right?

25   A    It could be.  I'm not sure.  We'll have to look at them.

1   Q    Let's see what we have got here.  793 is the cottage, it's

2        two photographs in this file in Exhibit 3.  Do we have the

3        same photograph?  Is No. 8 in Exhibit 3 the same as photo

4        No. 85?

5   A    It looks the same, yes.

6   Q    Okay.  The other photo in the attached file is 81 and does

7        that look like photo 86 in the homeowners' file?

8   A    Yes, it does.

9   Q    Okay.  So would it be fair to say those two pictures in the

10       flood file Exhibit No. 3 are also included in the

11       homeowners' file.

12

13  A    Yes.

14

15       [Off the Record]

16

17  Ms. Trotter:  We're back on.

18  Ms. Trotter:

19  Q    In the flood file for the home, Exhibit No. 4, there are

20       two photographs one on page 35; is that the same

21       photograph as in the homeowners' file No. 84?

22  A    Yes, that looks the same.

23  Q    Okay.  Now, in Exhibit 3 the flood file for the home there

24       is another photograph, No. 36 that you already testified

25       to as a picture of the gazebo; is that right?

126

1    A    Yes.

2    Q    That's not one of the last two of the five in the

3          homeowners' file that we just reviewed?  That would be an

4          additional photo that's not included in the homeowners'

5          file; would you agree?

6    A    True.

7    Q    Now the two photos that I do have here, photo 83 from the

8          10/10 inspection date, is a picture of your vehicle taken

9          from the property towards the water.  You testified that

10         was to show the distance or the proximity of the home to

11         the water?

12    A    Yes.

13    Q    The other photograph in the homeowners' file the last of

14         the file on 10/10 is No. 87, did you tell me you knew

15         exactly where that was or not on the property?

16    A    Um, I'm not 100 percent.  It looks like it's facing west.

17    Q    Okay.  Now my question to you was, did you take only five

18         photographs on 10/10?

19    A    Yes.

20    Q    Okay.

21    A    Well maybe six.

22    Q    Well maybe six.  Okay.  So my follow up question is having

23         looked at the two photographs, the two photographs

24         submitted by the Plaintiffs of the property where the

25         house was located in the homeowners' file do you have any

```
 1          pictures of where the house was located?
 2   Mr. Tucker:   Object to the form of the question.
 3   Ms. Trotter:
 4   Q    I mean I didn't see those.  I mean did you take pictures of
 5        where the house was?  Maybe they just didn't get uploaded.
 6   Mr. Tucker:   I think he has identified at least three times that
 7        that photograph shows what he believes to be the slab for
 8        the residence, the main dwelling.
 9   A    Page 84.
10   Ms. Trotter:
11   Q    Okay.  So page 84 is the picture for the dwelling?
12   A    That's what I believed to be the dwelling, yes.  And page
13        86 is, I believe, the cottage foundation, the overview,
14        but I'm not 100 percent sure of that.
15   Mr. Tucker:   For the record, if the plaintiff's have any colour
16        copies of photographs that they have not produced in this
17        matter, it's high time that we get those in to discovery.
18        I think the two you have in your hand are probably not
19        able to be produced in any more legible fashion than what
20        you have represented to the witness today.
21   Ms. Trotter:   To clarify for the record, they have been produced
22        to State Farm several times over.  They are also in expert
23        reports.
24   Mr. Tucker:   Are you saying that you produced in this litigation
25        colour, legible copies?
```

128

1   Ms. Trotter:  Absolutely.

2   Mr. Tucker:  Can we not refer to those as opposed to these?

3   Ms. Trotter:  Well this is what you've provided in the

4        homeownerrs' file.

5   Mr. Tucker:  Well that's because I thought it was presented to

6        us by AAA when they had their mediation claim.  But if you

7        have clear copies that would be the thing to look at today

8        as opposed to these facsimile versions.

9   Ms. Trotter:  Well, you know, if you would have a complete

10       homeowners' file here.

11  Mr. Tucker:  I'm sorry, we do.  I object the suggestion that the

12       facsimile copy provided to AAA somehow compromised the

13       validity of the homeowners' file.  That's just silly.

14  Ms. Trotter:  Those are there.

15  Ms. Trotter:

16  Q   Let's see, you have in your homeowners' file a fax

17       received, new mail received actually, June 27th that

18       includes those photographs.

19  Mr. Tucker:  A fax.  Exactly.  My request is for clear colour

20       copies.

21  Ms. Trotter:  They're not here.  You have clear color copies.

22       My question involves the investigation of the property and

23       why five pictures --

24  A   Six.

25  Ms. Trotter:  -- six pictures were sufficient or if really there

Case 1:08-cv-00509-JTS-RHW    Hargerson    October 19, 2009

129

```
 1           may have been some photos uploaded that weren't produced.
 2           So that's my question.
 3      Ms. Trotter:
 4      Q    Is it possible that you uploaded photos that were not
 5           produced?
 6      Mr. Tucker:  Object to the form of the question.  Calls for
 7           speculation.
 8      A    No.
 9      Ms. Trotter:
10      Q    So you are absolutely sure you only took six photographs of
11           this property?
12      Mr. Tucker:  Same objection.
13      A    I uploaded all of my photos in every claim that I did on
14           Katrina.
15      Mr. Tucker:  You are refusing to consider the 19th, and he said
16           these are possibly his.  He says he is not absolutely
17           sure.
18      Ms. Trotter:
19      Q    On 10/10 did you take more than six photos?
20      A    Not that I'm aware of.
21      Mr. Tucker:  Object to the form of the question.
22      Ms. Trotter:  Okay.  If you don't mind pulling out of that stack
23           over there, starting from page 90 through 164.  I will ask
24           you to -- actually wait a minute.  Pull 92 out and set it
25           aside.
```